## Biddle *et al.* versus Noble *et al.*

1. An entry upon an unseated tract, whether by an intruder or under the owner for residence or cultivation, makes the tract seated and prevents a sale for taxes.

2. The cultivation of several acres fixes the denomination of the whole, and charges the person of the cultivator so as to render a sale for taxes illegal.

[Biddle *v.* Noble.]

3. M. made an improvement on the Allegheny on a warrant of 1100 acres, on which there were other settlers adjoining the improvement. The owner, by articles reciting that M. owned an improvement on which he now resides on the east side of the river, agreed to sell him 200 acres so as not to interfere with claim of any other settler. This did not so define the land as to sever it from the remainder of the tract.

4. M. could not elect to run his lines where he chose so as to make the 200 acres, without notice to his vendor owning the remainder.

5. M. might lay off his 200 acres on notice to the owner, but must do it in a reasonable manner.

6. The consentable lines between the settlers would not help to designate the tract as they were not recognised by the owner.

7. In the absence of a line on the ground, the settlers could not assume where it would be so as to work a severance.

8. Beagle *v.* Wentz, 5 P. F. Smith, approved.

March 29th 1871. Before THOMPSON, C. J., READ, AGNEW and SHARSWOOD, JJ. WILLIAMS, J., at Nisi Prius.

Error to the Court of Common Pleas of *Warren county :* No. 147, to January Term 1870.

This was an action of ejectment, commenced November 9th 1867, by Margaret E. J. Biddle and others against Orange Noble and others, for lot No. 17 of the subdivision of warrant No. 5278, in Limestone township, Warren county.

The warrant is located on the east side of the Allegheny river, and contains in the whole 1100 acres ; it was patented to George Meade, June 14th 1794. No. 5280 is immediately below it (south), on the river. The whole warrant was sold at treasurer's sale, and his deed acknowledged to John Maybin, December 4th 1822. There were a number of settlements on the Allegheny river. Amongst the rest one of James Middleton—below him Matthew Hunter, about half of which was on 5280 ; above Middleton, was Joshua Richardson, including what was called the Tipton and Cohell Farms ; the Tipton being the west, and bounded on the west and north by the river, which here makes a bend towards the east ; the Cohell also being bounded northwardly by the river.

The annexed draft exhibits the localities, &c.

On the 11th of April 1826, Maybin, by articles reciting that Middleton owned " an improvement on which he now resides, which improvement is on the land of Maybin, on the east side of the Allegheny river," agreed to sell to Middleton " 200 acres of said land—to be bounded by the Allegheny river westwardly, and to include the aforesaid improvement, but not to interfere with the improvement claim of any other person on the lands of" Maybin. In 1834, the treasurer of Warren county sold 600 acres assessed as warrant 5278, for taxes of 1832-1833, to Russell and Newman. The plaintiffs are the owners of this title ; and claim under it in this suit. There was some evidence of the running of a line on the east side of the Middleton 200 acres before 1832.

[Biddle *v*. Noble.]

The controversy in this case was, whether the Middleton improvement had been severed from the remainder of warrant 5278, so as to make the 600 acres unseated, the plaintiffs relying principally upon the agreement of Maybin, and contending that it constituted a severance.

The case was tried October 28th 1869, before Johnson, P. J.

The plaintiffs gave in evidence the patent to Meade, the treasurer's sale as above stated, and the several conveyances of the 600 acres from intermediate holders, one of whom was E. J. Pettibone, and of lot No. 17 to them.

It was admitted that the title to the whole warrant was in Maybin in 1822, and that he had conveyed his title, at a date not given, to John Bowman; he conveyed to J. B. Johnson, October 14th 1847 ; Johnson to F. W. De Kantzow, May 18th 1850 ; Kantzow to W. Davidson, October 1st 1850 ; in the deed the land was described as " being 600 acres of tract No. 5278, called Springfield, that part back of lots formerly sold to some settlers on the river, subject to Pettibone's possession, taken unjustly." Also, a deed in September 1858, from the sheriff of Warren county to R. L. Baker and Jacob Henrici, and from them April 3d 1865, to Davidson. Davidson, on the 9th of August 1867, conveyed to Orange Noble, defendant, under whom the other defendants claim.

L. D. Richardson, a son of Joshua Richardson, fifty years of age, testified that he was born on the Tipton farm, and that there never had been a time since he knew the Middleton tract that some one did not reside on it, with 10 or 15 acres improvement; Middleton lived on the upper 100 acres of his tract ; Joshua Richardson had possession after him ; and Rufus Richardson occupied the lower 100 acres next to Hunter, made a large improvement, and lived there till his death in 1863 ; they had a line which they worked to ; James Price came into possession of the upper 100 acres in 1830, built a house, cleared 15 or 20 acres, and lived there till 1837 ; witness never knew of a line having been run till 1840. Both Joshua and Rufus Richardson claimed under Middleton's settler-right. After Price took possession there was a line made between him and Rufus, commencing at the river and running back, as near in the middle of the 200 acres as could be ; there was a fence on the line which Price and Rufus worked up to. W. Hilands made a survey in 1840. " In that year I carried chain ; started at a red or black oak at the south-west corner of Tipton land, run down to the Hunter land or claim ; then we run back east ; can't tell how far ; made a corner back in the woods ; saw no old line ; thence north, and made another corner ; saw no old line or corner ; thence west to the river ; no old line, or talk of any ; ran through an improvement on the river running the last line." Price had cut timber every year back of the

[Biddle v. Noble.]

line run in 1840; Rufus also cut back of that line. Middleton also testified that no line, so far as he knew, had ever been run on the back part of his settlement; that a conditional line had been agreed upon between Hunter and him, and that he had cut timber three quarters of a mile back from the river. His father, in 1822, had bought a settler's right from Thomas Arters, and died shortly afterwards. Witness divided with his brother, and took this place in 1824, and left it in 1827.

William Connelly, a surveyor, testified that at the request of Mr. McCalmont, attorney in fact of Maybin, in 1827 he made surveys for some of the settlers; Joshua Richardson, of the Tipton and Cohell farms, and Hunter; but did not make any survey for the Middleton settlement.

Matthew Hunter testified that his father moved on his tract in 1810, and his father and he have lived on it ever since; Connelly ran the lines for him in 1827. The line run between him and Rufus Richardson was recognised as the dividing line, they ran around witness's tract, commencing at his south-western corner and marked the corners; he was present only at the running of his own survey; Middleton then owned the 200 acres next above him; the Allegheny river was the boundary of all the settlers on the front; they all went back of their lands, cut timber, and ran it down to the river; he knew of no lines back of his corner on the Middleton tract previously to 1840; the Middleton tract had been settled before 1810. All the settlers on No. 5278 had designated lines and distances between them on the river; there were no improvements on the Middleton tract except on the river.

James Price testified that the corners of the Middleton tract were marked on the river and the east end; these corners were marked before 1831, when he moved on the land; he and Rufus Richardson understood their back line to be where the corners were marked; he paid taxes for three years of the land back of him; no line was run whilst he lived there; no line but the one he and Rufus had made; he returned the land back of his to the assessors.

The defendants gave evidence also of an old line on the south side of the Tipton and Cohell farms; also of a well-defined line of 1840, back of the Middleton tract. They gave evidence by a number of witnesses familiar with land for many years, that they knew of no such line anterior to 1840; and also by a number of surveyors who had made recent examinations and could find no marks of a line there earlier than 1840.

They gave evidence that the 600 acres were sold in 1866 at treasurer's sale for taxes to Mrs. Biddle, one of the plaintiffs; that it was redeemed in 1867 by Davidson, and the redemption-money paid to Mrs. Biddle.

[Biddle *v.* Noble.]

The plaintiffs in rebuttal gave in evidence the articles of April 11th 1826 between Maybin and Middleton. They offered a deed, dated November 7th 1838, from the executors of Maybin to Price and Rufus Richardson, reciting the articles with Middleton, his assignment to Joshua Richardson, his assignment of 100 acres to Price and 100 acres to Rufus Richardson, Maybin's death without making a deed, the decree of the Court of Common Pleas of Warren county, authorizing the executors to make a deed to Price and R. Richardson, and conveying the 200 acres to them by metes and bounds, commencing at Hunter's corner on the river, thence up the river to a red-oak, thence northwardly by Joshua Richardson, thence southwardly to Hunter's corner, thence westwardly to the beginning. They also offered the proceedings in the Court of Common Pleas which resulted in the decree to convey. Both offers were rejected, and several bills of exception sealed.

Henry McGee testified that in 1827 Connelly surveyed all around the Middleton tract; the witness helped him as axeman, and blazed the trees; Price was cutting over the line; witness showed him where the line was. Price said he knew it but intended to buy it.

The plaintiffs gave evidence to show where the east line of the Middleton tract would come to make 200 acres; viz., a line run south from the south-east corner of the Cohell farm to a point 45 perches east from Hunter's east corner.

There was evidence also for plaintiffs, that there might have been a line run through in 1827 without any marks remaining in 1867. There was a line thirty years old through the Middleton tract to its east line.

The plaintiffs gave in evidence assessment of 1827, 1828— Unseated, James Middleton, 100 acres. No. 5278, Unseated, 1100 acres.

| 1830. | No. 5278. | Matthew Hunter. | 200 acres, seated. | |
|-------|-----------|-----------------|------|------|
| | " " | Joshua Richardson. | 300 " | " |
| | " " | Rufus Richardson. | 100 " | " |
| | " " | Unseated assessments. | 500 acres. | |
| 1831. | " " | Similar. | | |
| 1832. | " " | James Price. | 100 acres, seated. | |
| | " " | Rufus Richardson. | 100 " | " |
| | " " | Joshua Richardson. | 200 " | " |
| 1833. | " " | River tracts. | 600 " unseated. | |
| | " " | Similar. | | |

Plaintiffs offered to prove that from 1834 to 1866, neither the defendants nor those under whom they claim, had ever paid any taxes, and that for twenty-one years after 1834, plaintiffs and their grantors did pay them, for the purpose of raising the presumption of an abandonment by them and their grantors.

[Biddle v. Noble.]

Objected to by defendants, objection sustained, and a bill of exceptions sealed.

The plaintiffs submitted two points which the court declined to answer, as not being in accordance with the rules of court.

The court in the charge said :—

* * * "The plaintiffs must recover on the strength of their own title. The defendants having the possession, are entitled to retain it until turned out by a title, not only better than their own, but good against all the world, so far as appears. Let us then examine the objections made to the plaintiffs' title. As to the question whether this tract No. 5278 was seated or unseated in 1832 and 1833. On that question depends the validity of the plaintiffs' title. The question is not whether there was at that time 600 acres of it unoccupied or unimproved or even unclaimed by an actual settler. An actual settler or occupant on any part of a tract, however large or however small his improvement, will make the whole tract seated unless the occupancy is by accident or mistake in clearing over the line by one intending to occupy land on another adjoining tract, or unless the occupant is a mere intruder and has designated his boundaries or the extent of his claim in some significant manner by lines marked on the ground, some natural or known boundary or by the improvements he has made. The question is not whether there was a responsible party living on the land, or personal property to pay the taxes upon a distress, but whether there is either an actual residence or a permanent occupancy for purposes of cultivation upon the land. If there be either, it gives to the entire tract so occupied the character of seated land, and exempts it from assessments and sale as unseated. From the undisputed evidence in this case the improvements previously made by Middleton and others, and occupied by Rufus Richardson and James Price in 1832 and 1833, were undoubtedly sufficient to give tract No. 5278 the character of seated land.

"Were this all the question before us, we would say at once the land was seated, and the treasurer's deed for it of 1834 was void. But it is claimed by the plaintiffs that there had been a severance of the portions they occupied from the balance of the tract so as to designate it a separate and distinct part of the land and exempt it from sale, leaving the balance to be regarded as unseated. A large tract may be so severed in two ways: 1st, by deed with metes and bounds; 2d, by occupancy with designated boundaries. If two men own a tract in severalty, the portion owned by each being described by metes and bounds, the parts of each may be assessed and sold severally, or either be sold although the other be seated. If one man owns a large tract, he may sell any portion of it by metes and bounds, on which the purchaser may settle and improve, without taking from the balance, unsold, the char-

[Biddle *v.* Noble.]

acter of unseated land. Thus those parts of this large tract that were occupied by Matthew Hunter on the south and the Cohell and Tipton farms on the north, were so sold, surveyed and severed from the balance of the tract as to entitle them to be treated as separate tracts, detached from the original survey which was not to be affected by the fact of their being improved. The man who settles on a tract of land and improves with or without claim of right, and claims to own and occupy a given quantity and no more, and designates his claim by a survey or by marks upon the ground, or by fences built or some other visible and notorious way, may so sever the part he occupies from the rest of the tract as to limit the consequences of his improvements to his own piece of the land and leave the balance still liable to be treated as unseated. But a residence and improvements by a mere intruder on any part of a tract, without such designation of boundary or claim, makes the whole tract seated. His occupancy renders him liable to be charged with the taxes of the entire tract. It is not the question whether he has been so charged by the assessing officers or has charged himself by returning the land to the assessor, but whether he is in the occupancy of the tract without defined boundaries.

" This brings us to the consideration of the main question in the case. Was there such a severance of the land claimed and occupied by Price and Richardson in 1832 and 1833 as to detach it from the remainder of the tract and leave it unaffected by the improvements they had made ?

" The undisputed facts are, that in 1827 the Matthew Hunter lot below, and Cohell and Tipton lots above, had been surveyed from the rest of the tract, leaving a space between of about 194 rods wide on the river. The lines on the other lots running back easterly from the river were nearly parallel, the one on the north being about 180 rods long, and the one on the south about 120. The Middleton improvement was on or near the river between these lines. * * * Middleton took a contract for 200 acres to include his improvements on the river, dated April 11th 1826.

" Was there any, and if any a sufficient designation of this 200 acres to sever it from the rest of the track ? No survey was made or lines run at the date of this contract. The improvement it included had been commenced sixteen years before, as the evidence informs us, and appears to have been kept up without interruption. Improvements had also been made and occupied prior to this, perhaps on the other parts of this lot, afterward appropriated to Hunter below and Joshua Richardson above. But independently of them the Middleton improvement had clearly, for many years, made tract No. 5278 a seated tract. Was there such a demarcation of the Middleton 200 acres as to throw out or cut off the balance of the tract and make it unseated ? If so, when and by whom ?

[Biddle v. Noble.]

" It is alleged on the part of the plaintiffs that there was a survey and the marking of lines around it in the summer of 1827 by William Connelly as surveyor. On this subject you have much evidence. Both parties seemed to have spent their energies and industry mainly on this point.

" On the part of the plaintiffs they prove by Henry McGee that a survey was made of the 200 acres claimed by Middleton in the summer of 1827 by an actual survey of the north and east, and 40 to 60 rods of the south lines," &c. * * *

The court recapitulated the evidence on this point.

" If McGee is true, and such a survey was made and lines run at the time alleged in 1827, then it would and did work a severance of the seated from the unseated parts of this tract, and subject the balance to assessment and sale as unseated. This would entitle the plaintiffs to recover so far as this question controls the right.

[" This brings us to consider the point made by the plaintiffs' counsel, that the contract made between McCalmont, as agent of Maybin, and Middleton, dated April 11th 1826, the surveys of Hunter below and Joshua Richardson above, and the separate assessments of 100 acres to Price and 100 acres to Rufus Richardson out of this tract in 1832 and 1833, sufficiently severed and designated their portions to leave the balance unseated and subject to sale as such. I have tried hard to persuade myself it would be so, but the weight of authority seems to be the other way.

" It is the purpose and policy of the law, whenever possible, to find some party personally responsible for the taxes, and perhaps it was often the purpose of settlers on unimproved lands, as these were, to avoid, as much as possible, the payment of taxes even on lands they occupied. Thus we find this entire tract of 1100 acres on the unseated list as late as 1828, although there had then been settlement and residence on it for nearly twenty years. Yet clearly no sale of it in 1828, or for many years prior to that time, as unseated, would have been valid. It was seated. What, then, had been done prior to 1832 to unseat it? Middleton took his contract in 1826. Does that work a severance? A contract of sale, especially if accompanied by a possession taken in pursuance thereof, as well as a deed of conveyance, may work a severance, even without a survey, if descriptive of the land by metes and bounds or by courses and distances. Without that I think it would not have that effect until the lines or boundaries were in some way marked on the ground, or otherwise designated by the mutual act of both parties, or the act of the one who had the authority to do so.

" Look at this contract. What does it do? It is easier to state what it does not do. It does not name the Joshua Richardson nor the Tipton and Cohell farms on the north, nor the Matthew

[Biddle *v.* Noble.]

Hunter claim or settlement on the south. Indeed no survey had ever been made for either. It gives no width or starting-point on the river. The tract was bounded about two miles on the river. It did not give the distance east that it should run, or either the direction or course or length of the north and south lines. Nor did it give to the purchaser the right to fix the location or shape of the 200 acres. No tree, stone, post or other mark, either natural or artificial, is given to designate any corner or line intended to bound the 200 acres. If a surveyor had been sent there to survey it with no guide but the contract, could he have run it out so as to say it was *per contract?* Certainly not. A deed with such a description would be void for uncertainty.

"The subsequent surveys for Hunter on the south and J. Richardson on the north could have no effect to give location or boundaries to this contract. The holder of this Middleton contract was not thereby authorized to take all the land on the river between these two surveys. If so, he might as well have located himself before these surveys were made all along the river, including the improvements of both Hunter and Richardson. This shows the unreasonableness of the theory that the vendee under the Middleton contract had the right to locate the 200 acres and fix its shape and boundaries. The vendor in that case very prudently reserves the right to do that, giving the purchaser no right to direct anything about it, except that it should touch the river and include the small clearing.

"We cannot therefore say that this contract so sufficiently designated the land by metes and bounds, or courses and distances, as to enable even a surveyor, much less an assessor, to tell what land belonged to the purchaser. The necessary conclusion is, that the contract of or in itself did not effect a severance of the two portions of land, so as to exempt the part not included in the contract from the character of seated land, or the occupant under that contract from his liability to pay the taxes on the whole lot. If then he was so liable by virtue of his occupancy the whole tract was seated and not liable to be sold, and the deed of the treasurer to Russell and Newman was void."] * * *

After being out some time the jury came into court and put the question to the court whether the occupants of the improvements on the river could suppose or designate where their back or east line was or would be; to this the court replied that in the absence of any survey or marks upon the ground, or of any deed or contract describing where it was or where it should be, the settlers had no right to say how far back their land run, or their claim extended. The contract under which they claimed in 1832 and 1833 carefully withheld from them the right to locate their own purchase as to its width on the river or its length east and west. The vendor had cautiously reserved that right to himself, and not

[Biddle v. Noble.]

having yet exercised it, if the evidence for the defence is relied on, the settlers could not designate it by merely supposing or assuming where their east line was or would be, so as to work a severance of their portion from the remainder of the tract.

The verdict was for the defendants.

The plaintiffs removed the record to the Supreme Court by writ of error.

They assigned for error :—

The portion of the charge in brackets :—the instruction to the jury when they came in for further instructions, not answering plaintiffs' points, and rejecting the plaintiffs' offers of evidence.

*J. R. Clark* and *W. D. Brown*, for plaintiffs in error.—The intention of an occupant as to the land he intends to seat determines whether it is seated or not: Ellis *v.* Hall, 7 Harris 292; Schaeffer *v.* McKabe, 2 Watts 421; Campbell *v.* Wilson, 1 Id. 503; Wallace *v.* Scott, 7 W. & S. 249; Miliken *v.* Benedict, 8 Barr 169. The contract with Middleton, the adoption of the river, and the surveys of Richardson and Hunter for boundaries were sufficient to sever the land for taxes, *id certum est quod certum reddi potest:* Erwin *v.* Helm, 13 S. & R. 151; Burns *v.* Sutherland, 7 Barr 103; Clement *v.* Youngman, 4 Wright 341. No particular mode of severance is necessary : Foster *v.* McDivit, 5 W. & S. 362; Crum *v.* Burke, 1 Casey 377. An uncertainty in a grant is remediable by the grantee as a grant is to be construed most favorably for him: Coxe *v.* Blanden, 1 Watts 533; 2 Bacon's Abr. 441, *Election;* 2 Washburn on Real Property 662.

*C. H. Curtis* and *R. Brown* (with whom was —— *Stone*), for defendants in error.—The separation by an intruder must be by lines distinctly marked on the ground: Jackson *v.* Sassaman, 5 Casey 106; Erwin *v.* Helm, 13 S. & R. 151; Green *v.* Watson, 10 Casey 332; Ellis *v.* Hall, 7 Harris 292; Dietrick *v.* Mason, 7 P. F. Smith 40.

The opinion of the court was delivered, May 8th 1871, by

AGNEW, J.—Nothing is better settled than this—that an entry upon an unseated tract of land by any one, whether as an intruder or under the title of the owner, either for the purchase of residence or for cultivation, makes the tract seated and prevents a sale for taxes: Campbell *v.* Wilson, 1 Watts 504; Kennedy *v.* Daily, 6 Id. 269; Wallace *v.* Scott, 7 W. & S. 247; Mitchell *v.* Bratton, 5 Id. 451; Wilson *v.* Watterson, 4 Barr 214. The cultivation of several acres fixes the denomination of the whole, and charges the person of the cultivator so as to render a sale for taxes

18 P. F. SMITH—19

[Biddle *v*. Noble.]

illegal: Sheaffer *v*. McCabe, 2 Watts 421 ; Nash *v*. Bum, 5 Id. 441.

That the tract known as 5278 was seated before the year 1826 is beyond all dispute. James Middleton had an improvement on the tract for many years before his purchase with no defined boundaries, except that as between him and Hunter and Richardson, also occupants of the tract, they had corners to mark their respective claims on the river side of the tract. It is therefore perfectly clear that the 600 acres sold in 1834 for the taxes of 1832 and 1833 were seated, unless the contract of Maybin with Middleton itself severed the 200 acres sold to Middleton from the remainder of the tract, or the boundaries of the 200 acres were sufficiently defined by actual lines on the ground to sever it at some time before the assessments of 1832 and 1833.

The question of fact, whether the Middleton 200 acres were at any time severed by survey or lines, was most distinctly submitted to the jury by the judge. He says :—

"Middleton took a contract for 200 acres to include his improvements on the river, dated April 11th 1826. *Was there any, and if any, a sufficient designation of these 200 acres to sever it from the rest of the tract ?* No survey or lines were run at the date of this contract. The improvement it included had been commenced sixteen years before, as the evidence informs us, and appears to have been kept up without interruption. Improvements had also been made and occupied prior to this, perhaps, on other parts of this lot, afterward appropriated to Hunter below, and Joshua Richardson above. But independently of them, the Middleton improvement had clearly, for many years, made No. 5278 a seated tract. *Was there such a demarcation of the Middleton 200 acres as to throw out or cut off the balance of the tract, and make it unseated ? If so, when and by whom ?*"

Here, then, the question is most distinctly put to the jury, and not restricted to time or person. It is the simple question, Was there a demarcation, *in point of fact, at any time or by any person ?*

Upon the facts the great controversy was, whether a survey was made by William Connelly in 1827? "Both parties," says the judge, "seemed to have spent their energies and industry mainly on this part." Henry McGee was the witness relied on by the plaintiffs to prove a survey. The judge proceeds to discuss the testimony on this point, and then winds up thus :—

"If Magee is true, and such a survey was made, and lines run at the time alleged in 1827, then it would and did work a severance of the seated from the unseated parts of the tract, and subject the balance to assessment and sale as unseated. This would entitle the plaintiffs to recover so far as this question controls the right."

[Biddle v. Noble.]

Now I do not see how it was possible to submit the question of separation of the 200 acres as a *fact* more fairly. The jury were left to say whether at any time and by any person the demarcation was in fact made. The verdict is a distinct answer, therefore, that the two hundred acres were never severed by survey or demarcation at any time, by any person.

This left but a single question—Was the agreement of sale by Maybin to Middleton *ipso facto* a severance? It will not do now, after the verdict has answered that no separation in fact was made, at any time or by any person, to run back to the ground, and to claim lines, corners or anything else, as adjunct to or to help out the terms of the agreement. The land was not severed on the ground. Was it severed by the terms of the writing?

The agreement recites that Middleton owns an improvement on which he now resides on the land of Maybin, and on the east side of the Allegheny river, in Deerfield township, and then proceeds to sell to him 200 acres of said land for the sum of $400, to be paid as thereinafter mentioned; to be bounded by the Allegheny river westwardly, and to include the said improvement, but not to interfere with the improvement-claim of any other person on the lands of the party of the first part. This is the whole description, and it is clear it defines no land, nor could a surveyor take the agreement and run out the 200 acres according to any terms set forth in the agreement. So cautious was the counsel of the plaintiff in error of this fact, that he fell back upon the right of Middleton himself to make a survey under the contract. But this is an immaterial question, for if we concede his right to lay off his own 200 acres, even without notice to Maybin, the mere right to do so does not separate the 600 acres. Did he exercise his right, did he lay off his own land? If he did, then there was a severance; if he did not, there was none. The verdict of the jury answers this question. Middleton never exercised his right, and his *right* concerned only his own land, not the 600 acres. The error of the judge, in construing the contract rights of the parties to it, if there were an error, did not touch the question. But the judge did not wholly err, even on that question. The same point arose in Beegle v. Wentz, 5 P. F. Smith 369, a case where the parties agreed upon a reservation of fifteen acres around a house without defining it. In such a case it was held that the law presumes that it is meant to be laid off in a reasonable shape around the house by the parties, and if one will not do it, the other can, upon notice to him of doing it. So here Middleton could not elect to run his lines where he might choose, and to cut his land off from the remainder, without regard to Maybin's interests in the remainder. The contract was for their mutual benefit; but if Maybin wrongfully refused to survey it off in a reasonable shape, Middleton could do it on proper notice; but even then ex-

[Biddle *v.* Noble.]

ercising his right in a reasonable manner. But this is beside the question, which is, not what Middleton *could* do, but what he *did* do; and the verdict answers that he did nothing.

The argument that Middleton would be exposed to pay the taxes of the 600 acres is without force. He was exposed to this before he made his purchase, and when he bought he took his contract as it was, and was perfectly safe in doing so, for he had the money in his own hands to secure himself. He was to pay the $400 purchase-money in five equal annual instalments. I have said that a surveyor could not take the article and make a survey of the 200 acres from its own terms. The Allegheny river was the western boundary, but that boundary was without length or terminal points, from which a measurement, to include the 200 acres, could start. The fact that the settlers had consentable corners does not help, for they were not recognised by Maybin. He fixed no length of line and no corners, and did not even agree that Middleton's land should abut that of Richardson or that of Hunter. Neither lines nor corners are mentioned in the agreement, and the only condition is that the survey shall not interfere with the improvements of any other person. In making the survey on the contract, it might overrun or fall short of these corners of the settlers. These consentable points on the river will not eke out the agreement which does not recognise them, nor can they make a survey in fact around the whole 200 acres, for they did not extend the full length of the tract eastwardly, and the jury have found that they were never joined together at the east, for they have determined that the survey was incomplete. The 600 acres were therefore severed neither in fact on the ground, nor potentially by the terms of the agreement.

It is argued that the answer of the court to the question of the jury, when they returned into court to ask further instruction, was confused. We do not think so. The *question* was somewhat confused, but the *answer* was perfectly clear, and consistent with the previous instruction. The question of the jury was, "whether the occupants of the improvements on the river could *suppose* or *designate* where their back or east line was or *would* be?" The question evidently meant to ask of the court, whether the settlers could *designate* their lines by *supposition;* that is, by estimating where they would be. But if there be a doubt as to the meaning of the question, there is none as to the answer, and the judge is not responsible for the confused language of the jury. He had before left them to find whether there was a line made at any time and by any person cutting off the 600 acres, and therefore he replied to the question, "that *in the absence of any survey or marks on the ground,* or of any deed or contract *describing where it was,* or where it should be, the settlers had no right to *say how far back* their land ran or their claim extended." There was no

[Biddle *v.* Noble.]

confusion in this. The attention of the jury was recalled to the great question in the cause, the existence in fact of a line on the ground, and then told that if there were *none*, the settlers could not make one by supposing where it would be. He then repeats his opinion as to Maybin's right under the contract to define the 200⅚ acres, a matter which we have explained, and shown to be really immaterial to this controversy, *in the absence of a survey or line on the ground.* He then concludes, "The vendor had cautiously reserved that right to himself, and not having exercised it, 'if the evidence of the defence is relied on, the settlers could not designate it *by merely supposing or assuming where the east line was or would be,* so as to work a severance of their portion from the remainder of the tract." There is no confusion in this. Indeed, it does not admit of a doubt. The substance was, that the jury asked him if the land in the contract could be designated by supposition, or calculation by estimation. He says, No—in the absence of a line on the ground the settlers cannot assume or suppose where it will be. Such a mode of estimation will work no severance. This was clearly right. Finding no error in the record, the judgment is

　　　　　　　　　　　　　　　　　　　Affirmed.

THOMPSON, C. J.—On the first argument of this case I was much inclined to the views of the learned counsel for the plaintiffs in error, that it was possible to bring the Middleton contract for 200 acres and improvement within the principle of a complete survey, excepting the closing line; in which case the law, I think, would regard it as closed, and severance complete under the practical maxim, "*Id certum est quod certum reddi potest.*" But the difficulty in the way of that view was, that there was no survey at all for the Middleton tract, as the jury have found, and no points from and to which such a closing line might be run, and therefore the principle was not applicable. Subsequent reflection and examination exploded this view, as the learned opinion of my brother Agnew shows, was to be expected.

SHARSWOOD, J., dissented.